## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

DEBORAH FISCHBACH,               :

     Plaintiff,               :          Case No. 3:11cv00016

 vs.                               :          Magistrate Judge Sharon L. Ovington

COMMUNITY MERCY HEALTH   :
PARTNERS, et al.,
                                 :
     Defendants.
                                 :

===

## DECISION AND ENTRY

===

## I.    <u>Introduction</u>

Plaintiff Deborah Fischbach brings this case claiming that her former

employer terminated her employment in violation of the Americans with

Disabilities Act, the Age Discrimination in Employment Act, Ohio Revised Code

§§4112.02(A), 4112.14, and the Employee Retirement Income Security Act.  She

further claims that her former employer's failure to accommodate her disability

violated her rights under the Americans with Disabilities Act.  Defendant

Community Mercy Health Partners is Plaintiff's former employer, and Defendant

Donna T. Boys is Plaintiff's former supervisor.   Defendant Community Mercy

Health Partners operates the Springfield Regional Medical Center, a full service medical facility located in Springfield, Ohio.

The case is before the Court upon Defendants' Motion for Summary Judgment (Doc. #24), Plaintiff's Brief in Opposition (Doc. #32), and Defendants' Reply (Doc. #34); Plaintiff's Motion for the Court to Refrain from Ruling on Motion for Summary Judgment FRCP [sic] 56(d) (Doc. #35) and Defendants' Memorandum in Opposition (Doc. #36); and the record as a whole.

## II.    Factual Background

### A.    Plaintiff's Early Success

In 1996, Plaintiff began working as a Casual Call Nurse at The Community Hospital of Springfield and Clark County, Ohio. She excelled as a Casual Call Nurse as shown by her promotion in May 1999 to the position of Director of Nursing. Her promotion included a significant pay increase to an annual salary of $62,000.00. She was 42 years old at that time. In her position as Director of Nursing, Plaintiff was responsible for nursing within a significant amount of the hospital but not the entire hospital. (Doc. #20, PageID at 100, Plaintiff's depos. at 59).

In 2004, The Community Hospital merged with Mercy Medical Center forming the Springfield Regional Medical Center. Around the time of the merger, Plaintiff maintained the title of Director of Nursing but her job also involved

leading the transition to electronic medical records.  *Id.,* Page ID at 100, Plaintiff's

depos. at 60.  Sometime after the merger occurred, Plaintiff became the Senior

Director of Nursing Services for the Springfield Regional Medical Center.  She

was 47 years old at that time.

A system-wide restructuring led, in part, to a change in Plaintiff's job title in

April 2007, when she became Director of Nursing Services.  Her pay and job

duties remained the same.  A memorandum to Plaintiff dated April 19, 2007 from

the Vice President of Human Resources stated, in part, "Thank you for being

patient with us as we make every effort to keep our organization on the cutting

edge of delivering the finest healthcare in our area.  Your leadership role plays an

integral part of our continued success and you are appreciated for all that you do to

take care of our patients and residents."  (Doc. #20, PageID at 163).

Plaintiff explained during her deposition that in 2007 or 2008, her job duties

"were increased to include all of the inpatient facilities in the hospital."  (Doc. #20,

PageID at 101-02, Pl.'s depos. at 64-65).

Plaintiff received a favorable job performance evaluation for the fiscal year

March 31, 2007 to March 31, 2008 by her then-supervisor Terry Pope.  (Doc. #20,

PageID at 254).  On June 20, 2008, Mark Weiner, President and Chief Executive

Officer of Springfield Regional Medical Center, wrote to Plaintiff, "This is a quick

note of appreciation for all the extra work and effort that you have put forth into

making the clinical consolidation happen.  You are a valuable member of the team.

Thank you."  (Doc. #33, PageID at 751).  But things changed over the next fiscal

year.

> **B.    Plaintiff's Next Yearly Performance Evaluation**

There is no genuine dispute that Plaintiff's next job evaluation in March

2009 – concerning  her job performance from March 31, 2008 to March 31, 2009 –

was not as good as her previous evaluation.  (Doc. #20, PageID at 255; *see id*.,

PageID at 103-04, Pl.'s depos. at 72-73).  In her March 2009 evaluation, Plaintiff

was rated below expectations in 4 out of 7 categories, including "servant

leadership," "strategic ability," "bias for action," and "developing others."  (Doc.

#20, PageID at 255-60).  In the remaining 3 categories – "passionate about core

mission," leading change," and "leading transition" – her performance met

expectations.  *Id*.  Terry Pope, who was still Plaintiff's supervisor, signed

Plaintiff's March 31, 2009 evaluation.

Plaintiff acknowledged during her deposition that at the time of her March

2009 evaluation, she did not dispute its accuracy.  Yet during her deposition, she

disagreed with many of the less-than-favorable comments in the March 2009

evaluation.  And she stated, "I should have fought it."  (Doc. #20, Page ID at 105,

Pl.'s depos. at 79).

## C.    Plaintiff's New Immediate Supervisor and Workplans

In April 2009, Defendant Boys replaced Terry Pope as Chief Nursing Officer, Vice President of Patient Care at Springfield Regional Medical Center. Defendant Boys became Plaintiff's immediate supervisor.

On May 13, 2009, Boys met with Plaintiff about her March 2009 job-performance evaluation. A few days later, Boys wrote a follow-up letter to Plaintiff stating that Plaintiff's job would be changed from Director of Nursing Services to Manager Patient Care for the 3 East Medical Unit. Although her annual salary of approximately of $123,801.00 remained the same, some of her benefits decreased. There is no genuine dispute that this job change constituted a demotion. (Doc. #20, PageID at 108, 112; Pl.'s depos. at 90-91, 106). In her letter, Boys also wrote, "Please see the attached Corrective Action Plan which we discussed to guide your journey going forward…." (Doc. #20, PageID at 261).

On or near May 18, 2009, Boys provided Plaintiff with a document titled, "90 DAY WORKPLAN." (Doc. #20, Page ID at 112, Pl.'s depos. at 107-08; *see* PageID at 262-64). Plaintiff testified that Boys "presented it as a plan for me – as a workplan to improve 3 East. It was not presented in any way as a … CAP-type procedure." (Doc. #20, PageID at 109, Pl's depos. at 94). Plaintiff testified during her deposition:

> Terry [Boys] did present this. As I said, when I actually
> confronted her about it, she made – she told me that it was a plan for

improvement and not to worry whether the goals were similar or
different from anybody else's basically or that they were stretched
because it wasn't going to have a consequence.  It was just a stretch
meet [sic] to be better and improve 3 East.

(Doc. #20, PageID at 112-13, Pl.'s depos. at 108-09).

The acronym CAP refers to the Corrective Action Plan or Procedure

described in Community Mercy Health Partners Associate Handbook.  (Doc. #20,

PageID at 229-32).  The Associate Handbook describes a four-step Corrective

Action Procedure:  Step One – Initial Counseling; Step Two – Written Warning;

Step Three – Final Warning and/or Suspension; and Step Four – Discharge.  *Id*.,

PageID at 231-32.

Returning to the document titled "90 DAY WORKPLAN," it contains a

column of yearly goals along with corresponding 90-day targets and action steps.

For example, one yearly goal states, "PEOPLE Assess and identify charge nurses

to fulfill the role as designed on 3E [3 East] and begin their development."  The

corresponding 90-day target states, "Strong, flexible charge nurses who are

willingly and actively carrying out the role and are assisting the staff to be

successful."  The corresponding action steps are described as, "Assessment of the

performance of all current regular charge nurses and develop a plan for removing

those not performing as expected by June 1, 2009."  (Doc. #20, PageID at 262).

Plaintiff acknowledge during her deposition that there were problems with

the charge nurses and that those charge nurses "were directly under the nurse

manage who reported to me [Plaintiff]." (Doc. #20, PageID at 110, Pl.'s depos. at 100). Plaintiff also acknowledged that Boys discussed with her the need to reorganize the charge nurses. Plaintiff further explained, "I had a discussion with her about that not being feasible in the timeframe that she wanted it done." *Id*.

Plaintiff also informed Boys that the 90 DAY WORKPLAN's goal of improving patient satisfaction to 75 percent during June and July 2009 "was impossible and wasn't being asked of any other place in the hospital." *Id*., PageID at 111, Pl.'s depos. at 204.

In August 2009, before Plaintiff's 90 DAY WORPLAN ended, Carolyn Carlton became Director of Nursing Services. Carlton also became Plaintiff's immediate supervisor and took over the supervision of Plaintiff's progress with the 90 DAY WORKPLAN. Plaintiff describes her working relationship with Carlton as "professional and … open and honest." (Doc. #20, PageID at 119, Pl.'s depos. at 133). When Carlton began supervising Plaintiff, Defendant Boys became Carlton's immediate supervisor.

By August 2009, when Plaintiff's 90 DAY WORKPLAN ended, the issues within Plaintiff's department had not all been "solved…, the workplan had not been met, as [Plaintiff] predicted it could not be." (Doc. #20, PageID at 118, Pl.'s depos. at 129-30). Plaintiff's employment was not terminated when her 90 DAY WORKPLAN ended in August 2009. Plaintiff believed that she, working together

with Carlton, was making progress, and they agreed that one of the goals "should be closed because it had been met as well as anybody could possibly meet it; but that was  not done."  *Id*., PageID at 119, Pl.'s depos. at 136.

On or around August 17, 2009, Placed was given another 90 DAY WORKPLAN.  Carlton supervised Plaintiff during her second 90 DAY WORKPLAN.

In early September 2009, Boys told Plaintiff that she – Plaintiff – needed an assistant.  Boys told Plaintiff, "You cannot do all the paperwork that must be done on that unit without an assistant."  (Doc. #20, PageID at 132, Pl.'s depos. at 186). Plaintiff agreed.  Plaintiff testified that this conversation with Boys about getting Plaintiff an assistant "had been ongoing since May 13th."  *Id*., Pl.'s depos. at 185.

On September 9, 2009, Plaintiff emailed Carlton, and copied Boys, a proposed list of "'guidelines' for an assistant manager … to get the ball rolling." (Doc. 20, PageID at 322).  Later that same day, Boys replied:  "I have always supported this for the 3E manager as you know.  You will need to fill out a justification form … so it can be attached when putting in the request for [the] position since this is a new position.  It will need to include how your grid will change to stay within your budget target and dollars."  *Id*., PageID at 323.  On September 21, 2009, Plaintiff emailed Boys a document titled "Assistant New

Manager – justification." Plaintiff asked: "[I]s this all you need to send through the requisition?" *Id*., PageID at 324-25.

On October 5, 2009, Plaintiff sent Carlton another justification form with additional information about the new position, including how money in 3 East's budget for overtime pay will be reduced and directed toward paying for the new Assistant Manager position. *Id*., PageID at 326-27. Plaintiff proposed this as a way to pay for a new Assistant Manager while staying within 3 East's budget.

Boys testified during her deposition that she did not authorize an Assistant Manager for Plaintiff because "we hadn't met the requirements" – especially paying for a new Assistant Manager while staying within the budget. (Doc. #22, PageID at 408, Boys' depos. at 37). Boys explained that reducing overtime pay as a way to pay for a new Assistant Manager "is not a method by which you can say that you will definitely be able to fit all of your desired structure within your budget or target hours." *Id*., Boys' depos. at 40.

### D. <u>Plaintiff's Knee Injury and Termination</u>

Before the second 90 DAY WORKPLAN ended in mid-November 2009, Plaintiff injured her knee (torn meniscus), walking through a Walmart parking lot. By late November 2009, Carlton had not mentioned to Plaintiff anything about the status of Plaintiff's WORKPLAN. And Plaintiff "really did not know what the status was." (Doc. #20, PageID at 121, Pl.'s depos. at 144).

Although Plaintiff took two or three days off work after injuring her knee, she returned to work during the remaining weeks of November 2009 despite her knee pain. She "used a cane primarily to get around after the time of [her] injury and [she] occasionally required a wheelchair to make it out of the building [the hospital] at night." *Id*., PageID at 125, Pl.'s depos. at 157-58. She was able to use a cane in her office in November 2009 and no one prevented her from using a cane in her office in November 2009. Plaintiff acknowledged during her deposition that she did not need to use a wheelchair in her office in November. *Id*., PageID at 125-26, Pl.'s depos. at 159, 161-62.

At some point, Plaintiff informed Carlton that she needed knee surgery. Carlton urged Plaintiff to undergo surgery in early December, and Plaintiff did so on December 2, 2009. After surgery Plaintiff could not bear weight on her leg. She was living by herself at the time. But she soon "realized that it was not working well and [she] went to stay with [her] sister." *Id*., Pl.'s depos. at 162. Plaintiff was using a cane or a walker to move around her sister's home; she used a wheelchair for moving longer distances when she went outside. Plaintiff's physician left it up to her to decide whether she needed to use a wheelchair. He said, according to Plaintiff, "You need to be nonweight bearing." *Id*., PageID at 129, Pl.'s depos. at 174-75.

On December 15, 2009, Plaintiff submitted an application to take leave under the Family and Medical Leave Act (FMLA). Her FMLA request was approved through January 13, 2010.

At some point in December 2009 Plaintiff told Carlton that she was able to work but could not get a wheelchair into her office. Plaintiff did not ask Carlton for a bigger office. She instead offered to work at home. Carlton agreed. And human resources gave Plaintiff permission to work at home. *Id*., PageID at 128, Pl.'s depos. at 172. Plaintiff testified, "Then all of the sudden, I get a call from Carolyn [Carlton] in an entirely different tone of voice. And it wasn't: Gosh, Deb, so you can recuperate, I don't want you bothered. It was: You will not have any contact in any way, shape, or form with anybody in the hospital period." (Doc. #20, PageID at 133, Pl.'s depos. at 191). This occurred in early-to-mid December 2009. *Id*.

On December 22, 2009, Carlton issued a memo to the 3 East staff, stating:

> Thank you all for your patience and dedication while we worked over the past several weeks to provide coverage in the absence of your Manager. I realize how difficult it is to continue to work at such a busy time without your Manager to assist.
>
> As you are aware, Deb Fischbach will be off for the next six to seven weeks. In an effort to provide support for the Staff of 3 East, the following schedule for Manager coverage has been coordinated. Linda Watson will be covering your Unit from December 22-December 29. Sara Root will be covering from December 29-January 4. Melissa Myers will assume the position of Acting Nurse Manager from January 4 until Deb returns.

Melissa has been an employee at Springfield Regional Medical Center for nearly 10 years. She has been Charge Nurse on 2 South and is a proven clinical expert. During the past 6 weeks, Melissa has served as the Acting Nurse Manager on 2 South and has done an excellent job. I am confident that she will make a smooth transition to the Acting Manager position on 3 East.

In an effort to provide Deb an opportunity to recuperate, I am requesting that all questions, concerns or issues be directed to Linda Watson or Sarah Root for the next two weeks and then to Melissa beginning January 4.

(Doc. #20, PageID at 328).

Plaintiff remained at home during December 2009 and January 2010. On January 12, 2010, her physician, Tarsem Garg, M.D., wrote a note on what appears to be a prescription pad stating that Plaintiff needed to remain on FMLA leave until January 18, 2010. (Doc. #20, PageID at 330). Dr. Garg also wrote, "Plaintiff may return to work on 1-19-10 with the follow[ing] restrictions: ambulation partial w/ limited standing and walking (no m[ore] than 30 minutes at a time)." *Id*. And Dr. Garg indicated, "Restrictions through 1-31-10." *Id*. (Doc. #20, PageID at 330). On January 25, 2010, Plaintiff faxed Dr. Carlton's return-to-work release to Julia Truman of human resources. *Id*., PageID at 329.

Plaintiff opposes summary judgment in part by relying on an undated work excuse signed by Dr. Garg. Dr. Garg indicates in this document that Plaintiff will be able to return to work on January 25, 2010 with "Ambulation as tolerated & may require use of cane." (Doc. #33, PageID at 737). A handwritten note by

Plaintiff, dated January 25, 2010, appears on the bottom of this document; it states,

"Carolyn, Here is a copy of the Return to Work Release that I emailed you about

on Friday & faxed to you earlier today." *Id*.

During January 2010, 3 East was in the process of converting to a Clinical

Decision Unit. Boys explains in her affidavit that the Clinical Decision Unit "is a

highly skilled area where patients are evaluated and decision [are] made about

treatment options that are based on frequent and detailed assessments, testing and

treatments. As such, nurses wanting to work with the CDU could not be in a

Corrective Action Plan and/or have attendance issues." (Doc. #24, PageID at 576).

Boys further explains:

> 12. Previously, Ms. Fischbach had emailed me on September 7, 2009 with a list of thirty one (31) nurses under her supervision that were allegedly in corrective action….
>
> 13. While Ms. Fischbach was out of the office on FMLA in December 2009 and January 2010, CMHP [Community Mercy Health Partners] needed to determine which nurses under her supervision were in corrective action so it could making staffing decisions relating to the CDU.
>
> 14. In early January 2010, during the review of … Ms. Fischbach's direct reports, Melissa Myer's (one of the three nurses temporarily covering for Ms. Fischbach until she returned from FMLA leave) discovered a large stack of incomplete Corrective Action Forms on top of Ms. Fischbach's desk.
>
> 15. The Corrective Action Forms were not signed by Ms. Fischbach or the affected employees, whom Ms. Fischbach had previously indicated were allegedly in corrective action. Some of the Corrective Action Forms were approximately one year old.

(Doc. #24, Boys' affidavit , PageID at 576).

Boys apparently learned of these problems with the Corrective Action Forms
from an email Melissa Myers wrote sent on January 26, 2010.  Myers wrote:

Carolyn,

I started acting as manager on 3 East 01-05-10 to help assist current
manager while on leave.  Upon arriving to 3 East I have found several
things that concern me.  They are as follows:

* A large  stack of corrective action forms that were filled out but
never sent to Human Resources.

* The associates of 3 East were not aware that they were being placed
in corrective action

* None of the corrective action forms were signed by the employees
but were signed by Manager.

* Attendance logs were not kept up to date.

* Attendance logs were not accurate

* Multiple staff members were not coached in FMLA when it was
appropriate for them placing them in risk of being in corrective action
and possibly losing their positions with SRMC.

* Call offs were not dealt with in a timely fashion with any staff
member.  There were as many as 23 call offs with no counseling or
corrective action taken.

* Every staff member on 3 East has an employee file.  In these files
are things that are required by JACHO.  Almost every file had
something missing from it.  I am now in the process of retrieving the
items necessary.  Please see the attached list.

(Doc. #20, PageID at 331). Plaintiff disagrees with the accuracy of some items in this list. She also asserts that to the extent some of these problems existed, their existence supports her asserted need to have an assistant, which Defendants acknowledged (through Defendant Boys) but failed to provide. *Id.*, PageID at 134-35, Pl.'s depos. at 193-99.

Although Plaintiff made arrangements to return to work in late January 2010, Carlton phoned her on or around January 26 and told her not to come to work because she had been placed on administrative leave. Carlton declined to explain to Plaintiff why she had been placed on administrative leave. Around this time, Julia Truman of human resources scheduled a meeting with Plaintiff. It was obvious to Plaintiff that she was facing termination, and she told Truman that she would bring her attorney to the meeting. *Id.*, PageID at 138-39, Pl.'s depos. at 210-14.

Boys testified during her deposition that she and Carlton, with feedback from Truman, jointly decided to terminate Plaintiff's employment. (Doc #22, PageID at 413, Boys' depos. at 57).

Plaintiff met with Truman and Boys on or near February 1, 2010. During the meeting, Boys read Plaintiff the contents of a Corrective Action Form concerning the decision to terminate her employment. (Doc. #20, PageID at 390-92). The Corrective Action Form identified the type of action taken as "discharge"

and listed numerous reasons for action, including the problems identified in Myers'

January 26 memo. Under the heading "Previous Corrective Actions…," the

Corrective Action Form noted that Plaintiff "was demoted from her position as

Director of Nursing in 2009 for unsatisfactory job performance." *Id.*, PageID at

390. The Form also noted that in May 2009 Plaintiff "was placed in an action plan

to improve her performance[.] The action plan was extended by an additional 90

days due to lack of progress made during the initial action plan." *Id.*, PageID at

391.

Under the heading "Impact of Associate Performance…," the Corrective

Action Form stated:

> By not coaching associates Deb decreased the performance of
> her unit. By not holding associates accountable as required, Deb
> decreased the organizations' effectiveness. By not removing the NCC
> title of an associate in step three CAP with known performance issues
> she placed the organization at risk[.]

> Deb had thirty-seven unsigned corrective actions in her office
> which placed the organization at risk and decreased the effectiveness
> of her staff.

> By not ensuring her associate files were complete she placed the
> organization at risk. By not ensuring her associate files contained the
> appropriate documentation for Joint Commission Compliance she
> placed the organization at risk[.]

(Doc. #20, PageID at 391). The Corrective Action Form concludes, "Deb is being

terminated effective immediately." *Id.*

There is no genuine dispute that Plaintiff was not given a larger office after her knee surgery. It is likewise undisputed that Plaintiff's replacement, Melissa Myers, was assigned to work in Plaintiff's former office. Myers was later moved into a larger office. Myers was age 41, over 10 years younger than Plaintiff, at the time she replaced Plaintiff as Manager Patient Care in 3 East. (Doc. #32, PageID at 709).

III. **Discussion**

    A.   **Summary Judgment Standards**

A party is entitled to summary judgment when there is no genuine dispute over any material fact and when the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Barker v. Goodrich*, 649 F.3d 428, 432 (6th Cir. 2011).

To resolve whether a genuine issue of material fact exists, the Court draws all reasonable inferences in the light most favorable to the non-moving party. *Richland Bookmart, Inc. v. Knox County, Tenn*., 555 F.3d 512, 520 (6th Cir. 2009)(citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp*., 475 U.S. 574, 587-88, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). With these reasonable inferences in the forefront, "[t]he central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Jones v. Potter*, 488 F.3d 397, 402-03 (6th

Cir. 2007) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); quoting, in part, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)). "Accordingly, '[e]ntry of summary judgment is appropriate 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Whitfield v. Tennessee*, 639 F.3d 253, 258 (6th Cir. 2011) (citations omitted).

### B.     Plaintiff's ADEA Claim

Plaintiff claims that Defendants terminated her employment, at least in material part, because of her age (53 years old on the date of her termination) in violation of the Age Discrimination in Employment Act (the ADEA) and Ohio Revised Code §4112.99.

Defendants contend that they are entitled to summary judgment on Plaintiff's age-discrimination claims because they terminated her employment for legitimate, non-discriminatory reasons and because Plaintiff cannot show that Defendants' reasons were a pretext for age discrimination.

The ADEA prohibits employers from discriminating "against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a); *see Ercegovich v.*

*Goodyear Tire & Rubber Co.*, 154 F.3d 344, 350 (6th Cir. 1998). "The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination." *Geiger v. Tower Auto.,* 579 F.3d 614, 620 (6th Cir. 2009) (quoting *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 153 (2000)). The burden of persuasion remains at all times on the plaintiff to establish "'that age was the 'but-for' cause of [her] employer's adverse action.'" *Geiger,* 579 F.3d at 620 (quoting *Gross v. FBL Financial Services, Inc.*, __ U.S. __, 129 S.Ct. 2343, 2351 n. 4 (2009)).

Plaintiff does not point to direct evidence showing that Defendants terminated her employment in violation of the ADEA. Analysis of her ADEA claim therefore focuses on the circumstantial evidence of record and begins with whether she can show a prima facie case of age discrimination. *See Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 411 (6th Cir. 2008).

Plaintiff's prima facie case must consist of evidence showing that (1) she was over age 40; (2) she was subjected to an adverse employment action; (3) she was otherwise qualified for the job she held; and (4) she was replaced by a younger person. *See Geiger,* 579 F.3d at 620; *see also Mickey v. Zeidler Tool and Die Company*, 516 F.3d 516, 521 (6th Cir. 2007). Defendants do not challenge

Plaintiff's prima facie case.  And it is easily shown.  She was age 53 on the date

Defendants terminated her employment; her termination constituted perhaps the

quintessential adverse employment action; she was otherwise qualified for her job,

by dint of her education and years of work experience, *see Wexler v. White's Fine*

*Furniture, Inc*., 317 F.3d 564, 574 (6th Cir. 2003) ("court may not consider the

employer's alleged nondiscriminatory reason for taking an adverse employment

action when analyzing the prima facie case."); and she was replaced by person

slightly more than ten years younger (Melissa Myers, age 43), *see Grosjean v.*

*First Energy Corporation*, 349 F.3d 332, 335-36 (6th Cir. 2003) (Replacement not

required to be under age 40, only required to be "a significantly younger person."

"Age differences of ten or more years have generally been held to be sufficiently

substantial to meet the requirement of the fourth part of age discrimination prima

facie case.").

In light of Plaintiff's prima facie case, Defendants must articulate a

legitimate, non-discriminatory reason for terminating her employment.  *See*

*Martin*, 548 F.3d at 411.  Defendants have met this burden of production by

asserting that they terminated Plaintiff's employment because of her

"unsatisfactory job performance and continuing violations of CMHP polices and

rules, the latest of which were discovered during her FMLA leave."  (Doc. #24,

PageID at 567); *see, e.g., Majewski v. Automatic Data Processing, Inc.*, 274 F.3d

1106, 1116 (6th Cir. 2001) (employer articulated a legitimate, non-discriminatory reason – the employee's "increasingly poor job performance….").

Defendants' articulation triggers Plaintiff's burden to show the presence of a genuine issue of material fact concerning whether Defendants' legitimate, non-discriminatory reasons constitute a pretext for age discrimination. *See Hendrick v. Western Reserve Care System*, 355 F.3d 444, 460 (6th Cir. 2004). Three paths of proof are possible: "either (1) … the proffered reasons had no basis in fact, (2) … the proffered reasons did not actually motivate [her] discharge, or (3) … they were insufficient to motivate discharge." *Id*. (quoting *Pennington v. Western Atlas, Inc*., 202 F.3d 902, 909-10 (6th Cir. 2000) and *Manzer v. Diamond Shamrock*, 29 F.3d 1078, 1083-84 (6th Cir. 1994)).

Defendants contend that Plaintiff cannot meet her burden of showing pretext because during her deposition, she testified that she "thought" "she was terminated due to her tenure with CMHP and her knowledge of the previous culture and environment of CMHP. Mere conjecture, however, that the employer's stated reason is a pretext for discrimination is an insufficient basis for the denial of a motion for summary judgment by the employer." (Doc. #24, PageID at 568) (footnote omitted).

Relying largely on her affidavit,[1] the sum and substance of Plaintiff's effort

to show pretext is the following:

> Plaintiff argues that the true motivation for her discharge was her physical disability and age. Plaintiff further argues that terminating her was a more drastic step than what was ordinarily taken for a work plan in place. In addition, her replacement was less qualified and paid less than half of Plaintiff's wages. Less than six months after she replaced [Plaintiff] she [Myers] resigned and the organization was in the same poor shape per her personnel file. Despite the explanation offered by Plaintiff and her hard work, she was terminated from employment.

> The Court should not view Plaintiff's testimony as precluding a showing of pretext. Whether Plaintiff can establish pretext must be considered in view of the record as a whole, not simply from one response Plaintiff gave on deposition. Plaintiff's affidavit is replete with examples that the termination was really a pretext and specifically addressed each item.

> The Plaintiff asserts that for the purposes of Summary Judgment she has established sufficient evidence of pretext.

(Doc. #32, PageID at 710-11)(footnote omitted).

Plaintiff's contentions fail to show pretext for several reasons. First,

Plaintiff has not presented affirmative evidence, which when construed in her

favor, shows that Defendants' reasons for terminating her employment had no

basis in fact. Plaintiff's own affidavit belies such a showing because her

---

1 Defendants contend that Plaintiff's post-deposition affidavit cannot be used to create a genuine dispute over a material fact because her affidavit contradicts her deposition testimony in several respects. While this is generally so for a party facing a motion for summary judgment, *see Aerel, S.R.L. v. PCC Airfoils, L.L.C.*, 448 F.3d 899, 906-08 (6th Cir. 2006), there is no need to parse out where Plaintiff contradicts herself, if at all. Even if Plaintiff's affidavit is credited and construed in her favor, it does not assist her in avoiding summary judgment. *See Aerel*, 448 F.3d at 909.

explanations do not assert the factual correctness of Defendants' reasons; she instead explains why, from her perspective, Defendants' reasons did not support her termination. For example, Plaintiff states, "As to 37 typed but unsigned CAPS: I had printed them out so that I could review them and determine which one had to be signed, and then make a formal appointment with each individual to discuss each CAP. It had to be taken care of in the appropriate manner, (face to face meeting), rather than placed in the associate's mailbox. The CAPS were written later in the evenings before I left work." (Doc. #33, PageID at 718). In this manner, Plaintiff states her reasons why there were 37 unsigned CAPS, but she does not contest the fact that she had not signed 37 CAPS and provides no evidence contradicting Boys' explanation of why properly documented CAPS were needed – specifically, to ensure that qualified nurses were assigned to work in the Clinical Decision Unit. Plaintiff's remaining explanations, like her explanation of the 37 unsigned CAPS, do not probe the factual accuracy of Defendants' termination reasons.

The closest Plaintiff comes to challenging the factual basis of Defendants' legitimate, non-discriminatory reasons is her assertion, in her affidavit, that it was untrue that she failed to inform staff members with serious health problems about leave available under the FMLA. But, Plaintiff does not address the details of Defendants' asserted reason. The Corrective Action Form states, "There were staff

members on 3E who had serious health events who were not offered FMLA information nor were they coached about the process, per the associates and validated by the lack of documentation in the file." (Doc. #20, PageID at 390). "[A]s long as the employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is shown to be incorrect. An employer has an honest belief in its reason for discharging an employee where the employer reasonably relied on the 'particularized facts that were before it at the time the decision was made.'" *Majewski*, 274 F.3d at 1117 (quoting in part *Smith v. Chrysler Corp.*, 155 F.3d 277, 807 (6th Cir. 2001). Because Defendants relied on the lack of FMLA documentation as support for this problem with Plaintiff's job performance, and because Plaintiff has not presented any evidence indicating that she included the required FMLA documentation in employees' files, the record lacks a genuine dispute over Defendants' reasonable belief in the existence of this job-performance problem.

Plaintiff next argues, in essence, that Defendants' reasons were insufficient to support termination because her termination was a more drastic step than what was ordinarily taken when an employee had a WORKPLAN in place. It is undisputed, however, that Plaintiff was a member of management and that Defendants used a more flexible approach to improving her job performance than

applied to associates under Community Mercy Health Partners Associate Handbook. Defendants implemented this flexible approach by placing Plaintiff on two 90 DAY WORKPLANS, each identifying certain problems with Plaintiff's job performance, and by not deciding to terminate her employment until late January 2010, after the effects of certain omissions by Plaintiff came to light through Myers' memorandum. There is likewise no genuine dispute that 3 East was transitioning to a Critical Decision Unit by January 2010 and that Plaintiff's omissions and poor record-keeping with regard to Corrective Action Plans created staffing problems – specifically, which nurses would be eligible to work in the Critical Decision Unit – that would not have existed in she had completed the Corrective Action Plans as Defendants required. Because of this, and the other problems identified by Defendants in her final Corrective Action Form, *see* Doc. #20, PageID at 390, there is no genuine dispute that its legitimate, non-discriminatory reasons were sufficient to warrant Plaintiff's termination.

Plaintiff contends that her job-performance problems existed because Defendants had not provided her with the main thing she needed – an assistant. Plaintiff emphasizes that Boys agreed as early as May 2009 that she needed an assistant. Accepting these facts as true does not assist Plaintiff in showing pretext. Plaintiff's emails reveal that she did not "get the ball rolling" to obtain an assistant until September 9, 2009. (Doc. #20, PageID at 322). Boys supported Plaintiff and

responded with instructions about what she needed to submit, mainly budgetary justification, in order to obtain an assistant. Although Plaintiff attempted to provide sufficient budgetary justification by proposing that overtime pay be reduced to pay the new assistant, it is undisputed that Boys rejected this proposal as too uncertain to keep within 3 East's budget. *See* Doc. #22, PageID at 408, Boys' depos. at 40. Plaintiff has not presented any evidence showing that Boys' budgetary concern was unfounded, unwarranted, or factually inaccurate. As a result, Plaintiff has not pointed to evidence showing that Boys' budgetary concern and denial of Plaintiff's request for an assistant were a pretext for age discrimination.

Returning to Defendants' reasons for terminating Plaintiff's employment, and construing the evidence in her favor, Plaintiff has not demonstrated the existence of a genuine dispute over the fact that Defendants had a reasonably-held belief about her work-performance problems. *See Majewski*, 274 F.3d at 1117. Defendants documented Plaintiff's poor job performance in both her first and second 90 DAY WORKPLAN. Defendants did not automatically terminate Plaintiff's employment at the conclusion of either 90-day period. Instead, Boys did not act until further information about Plaintiff's job-performance problems came to light in late January 2010 by way of Myers' email. Even if a jury credited some of Plaintiff's explanations for these problems, the record lacks evidence

showing that Defendants did not reasonably rely on the existence of Plaintiffs' two

90 DAY WORKPLANS and the reasons Myers listed in her email a basis for

terminating Plaintiff's employment.  Consequently, no genuine dispute exists over

the fact that Defendants held an honest belief in its reasons for terminating

Plaintiff's employment.  *See Majewski*, 274 F.3d at 1117.

As to Plaintiff's state age-discrimination claim, "[u]nder Ohio law, the

elements and burden of proof in a state age-discrimination claim parallel the

ADEA analysis."  *Ercegovich*, 154 F.3d at 357 (citing, in part, *Barker v. Scovill,*

*Inc.*, 6 Ohio St.3d 146 (1983).  Because of this, and in light of the above analysis,

Defendants are entitled to summary judgment on Plaintiff's claims in Counts 2 and

3 of her Complaint that Defendants terminated her employment because of her age

in violation of Ohio law.[2]

Accordingly, Defendants are entitled to summary judgment on Plaintiff's

claims under the ADEA and Ohio law in Counts 2 and 3 of her Complaint.

C.    **Plaintiff's ADA Claims**

The Americans with Disability Act of 1990 provides, "No covered entity

shall discriminate against a qualified individual on the basis of disability in regard

to job application procedures, the hiring, advancement, or discharge of employees,

---

2  This conclusion renders superfluous Defendants' argument that Plaintiff's act of filing a
charge of discrimination with the Ohio Civil Rights Commission before filing this case
constituted an election of remedies precluding her from proceeding with her state law claim of
age discrimination.

employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).

Plaintiff claims that Defendants violated her rights under the ADA in two ways:  terminating her employment because of her disability and failing to provide her with a reasonable accommodation of her disability.

"As a threshold issue, a disability-discrimination plaintiff must establish that she suffers from an impairment that qualifies as a 'disability.'  A person is defined as having a 'disability' within the meaning of the ADA is she has 'a physical or mental impairment that substantially limits one or more of the major life activities of such individual.'"  *Bryson v. Regis Corp.*, 498 F.3d 561, 574-75 (6th Cir. 2007)(quoting, in part, 42 U.S.C. §12102(2)(A); footnote omitted).

Defendants contend that they are entitled to summary judgment on Plaintiff's ADA claim because she cannot show that her knee injury constituted a "disability" under the ADA.  Defendants reason that Plaintiff's knee injury was temporary – "3 months from injury to full recovery, during which time she worked at [Springfield Regional Medical Center] one month."  (Doc. #24, PageID at 566) (parentheses omitted).  Defendants further argue that the record lacks evidence indicating that Plaintiff's knee injury had a long-term impact or substantially limited a work activity or a major life activity as of the date of her termination.  *Id.*

Plaintiff contends that her knee injury constituted a disability because she was unable to walk without a cane and needed a wheelchair when standing for long periods of time at work or going to or from her car after her injury occurred on October 31, 2009. Plaintiff further maintains, "Taking all of the pertinent evidence into consideration, this Court can only conclude that a genuine issue of material fact exists as to whether Plaintiff is substantially limited in her ability to walk as to render her disabled for purposes of the ADA. It is undisputed that Plaintiff had sustained a serious injury to her left knee." (Doc. #32, PageID at 706).

There is no genuine dispute that Plaintiff suffered a serious knee injury on or about October 31, 2009. Because Plaintiff's knee injury affected her musculoskeletal system, requiring her to use a cane to walk and, at times, a wheelchair to move longer distances, her knee injury constituted a physical impairment under the ADA. *See Black v. Roadway Express, Inc*., 297 F.3d 445, 450-51 (6th Cir. 2002); *see also Gretillat v. Care Initiatives*, 481 F.3d 649, 652 (8th Cir. 2007) ("The condition affecting Gretillat's right knee qualifies as a 'physical impairment' under the ADA."); *Szalay v. Yellow Freight System, Inc*., 998 F.Supp. 799, 802 (N.D. Ohio 1996).

"Merely having an impairment does not make one disabled for purposes of the ADA. A claimant must also establish that her impairment 'substantially' limits

one or more 'major life activities.'" *Bryson v. Regis Corp.*, 498 F.3d 561, 575 (6th

Cir. 2007). "[T]he requirement that an impairment 'substantially' limit a major life

activity 'precludes impairments that interfere in only a minor way … from

qualifying as disabilities.'" *Bryson v. Regis Corp.*, 498 F.3d 561, 575 (6th Cir.

2007)(quoting, in part, *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 196

(2002)). "One of the factors that is relevant to determining whether an impairment

amounts to a disability is whether it is 'permanent or long-term.'" *Bryson*, 498

F.3d at 575 (quoting, in part, *Toyota*, 534 U.S. at 198 (stating that '[t]he

impairment's impact must also be permanent or long-term.')(citing 29 C.F.R. §§

1630.2(j)(2)(ii)-(iii)). "Generally, short-term restrictions are not substantially

limiting." *Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir. 1996).

Construing the record in Plaintiff's favor, no reasonable jury could conclude

that her knee impairment was anything but a short-term, temporary impairment.

The evidence shows that the from the date of her injury on or about October 31,

2009, through the date of her knee surgery in early December 2009, until her

surgeon Dr. Garg released her to return to work in late January 2010, only three

months had passed. The prescription-pad work release written by Dr. Garg

establishes that she had only minor physical restrictions starting on her return-to-

work date, January 19, 2010 – namely, "ambulation partial w/ limited standing and

walking (no m[ore] than 30 minutes at a time)." (Doc. #20, PageID at 330). Dr.

Garg further noted that her restrictions applied "through 1-31-10." Dr. Garg provided no particular information in his prescription-pad work release from which a jury could reasonably conclude that Plaintiff would have any work limitations after January 31, 1010. To avoid this conclusion, Plaintiff relies on another work excuse written by Dr. Garg, which released Plaintiff to return to work on January 25, 2010, noting her restrictions as, "Ambulation as tolerated & may require use of cane." (Doc. #33, PageID at 737). This work excuse did not change or contradict Dr. Garg's prescription-pad work release indication that Plaintiff's work restrictions applied through January 31, 2010. Reading the two documents together and construing them in Plaintiff's favor, no jury could reasonably conclude that Plaintiff's knee impairment substantially limited her ability to walk or work after January 31, 2010.

Plaintiff also relies on her post-deposition affidavit in which she challenges Defendants' view of the evidence. Plaintiff explains, "the statement in Defendant's Brief that Plaintiff's disability was only for 3 months is incorrect. Attached is a copy of [her knee surgeon] Dr. Garg's report, Exhibit C. Also, the surgery was not successful as the joint was not repaired although the torn meniscus was physical [sic]. I had to use a cane until my knee was replaced on June 14, 2011." (Doc. #33, PageID at 715). Exhibit C attached to Plaintiff's affidavit is the work excuse written by Dr. Garg. As explained above, this work excuse does not

create a genuine dispute over the lack of work restrictions on Plaintiff after January 31, 2010. In addition, assuming – as Plaintiff alleges in her affidavit – that her knee impairment continued after January 31, 2010 and that she continued to need to use a cane until her knee-replacement surgery on June 14, 2011, these additional facts do not show that her knee impairment was anything more than a temporary impairment at or near the time of her termination. Because Plaintiff's surgeon cleared her to work without restriction after January 31, 2010 and because she was terminated on February 1, 2010, the later deterioration of her knee impairment does not assist her in showing that she was under a disability at the time of her termination. *See Kocsis v. Multi-Care Mgmt., Inc.*, 97 F.3d 876, 884 (6th Cir. 1996) ("In order to recover on any of her ADA claims, Kocsis must first establish as part of her prima facie case that she was a 'qualified individual with a disability' *at the time of the discriminatory act.*")(emphasis in *Kocsis*) (footnote omitted).

Accordingly, for all the above reasons, Plaintiff has not shown that her knee impairment constituted a disability at the time of her termination or that a genuine dispute exists in the record over whether she was under an ADA-covered disability. Because Plaintiff has not made this threshold showing, Defendants are entitled to summary judgment on Plaintiff's claims that her termination violated the ADA and that Defendants violated the ADA by failing to provide her with a reasonable accommodation of her disability.

Defendants also contend that summary judgment on Plaintiff's ADA claim is also warranted because they had legitimate, non-discriminatory reasons to terminate her employment and because Plaintiff has not presented evidence establishing that its reasons were a pretext for disability discrimination. These contention are well taken. For the reasons discussed previously, *supra*, §III(B) Plaintiff has not presented sufficient evidence to create a genuine dispute over whether Defendants' legitimate, non-discriminatory reasons for terminating her employment constitute a pretext for disability discrimination.

The above analysis of Plaintiff's ADA claim applies equally to any claim that Defendants terminated her employment in violation of Ohio's statutory prohibition against handicap discrimination. *See Plant v. Morton Intern, Inc*., 212 F.3d 929, 938-39 (6th Cir. 2000)(and cases cited therein).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's claim of disability discrimination in Count 1 of her Complaint.

**D.      Plaintiff's ERISA Claim**

Plaintiff claims that Defendants interfered with her rights protected under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §1140, by terminating her employment for the purpose, at least in material part, of preventing

her from receiving full retirement benefits due her under an ERISA-governed employee benefit plan.[3]

Defendants contend that they are entitled to summary judgment on Plaintiff's ERISA claim because Community Regional Health Partner's Defined Contribution Retirement Plan is a church plan that is exempt from Title I of ERISA and not subject to Plaintiff's ERISA-interference claim under 29 U.S.C. §1140. Defendants rely on the affidavit of William Strangfeld, the vice president of human resources "Compliance with Catholic Health Partners, the corporate parent of Catholic Health Partners – Western Ohio, which holds a fifty percent (50%) interest in Community Mercy Health Partners…." (Doc. #26, PageID at 593). Strangfeld asserts, "3. The Community Mercy Health Partners Contribution Retirement Plan satisfies the definition of, and is operated as a 'church plan' under Section 414(e) of the Internal Revenue Code of 1986, as amended. 4. The Community Mercy Health Partners Defined Contribution Retirement Plan has not elected to be subject to the rules and obligations imposed under the Employer [sic] Retirement Income Security Act of 1974, as amended, and thus remains exempt by such rules by maintain its church plan status." *Id.*

---

3  ERISA's anti-interference provision, 29 U.S.C. §1140, provides, "It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan…, or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan…."

"Church plans are not ERISA plans." *Chronister v. Baptist Health,* 442 F.3d 648, 651 (8th Cir. 2006); *see* 29 U.S.C. §1003(b)(2). Plaintiff does not address whether or not Community Mercy Health Partners Contribution's Retirement Plan satisfies the definition of, or is operated, as a "church plan." Plaintiff instead relies on her affidavit and limits her argument to the circumstances of her termination. She asserts, "Count 4 of the Complaint is accurate and states a valid cause of action against the Defendant for violating the Employee Retirement Income Security Act. She worked at the hospital approximately 14 years and stated that she was familiar with the pension plan provided by the Defendant and that she would have full benefits in two more years. As a result of Defendant's wrongful actions she stated she has been damaged financially." (Doc. #32, PageID at 711-12). These arguments fail to address and demonstrate that Community Mercy Health Partners Contribution's Retirement Plan does not satisfy the definition of, or is operated as, a "church plan." The record in the instant case, moreover, lacks evidence upon which a reasonable jury or the Court could conclude that the Retirement Plan is not a church plan.

Plaintiff's ERISA-interference claim does not survive summary judgment for another reason: no genuine dispute exists over Defendants' legitimate, non-discriminatory reasons for terminating her employment. Because of this, no jury could reasonably conclude that Defendants terminated Plaintiff's employment for

the purpose of interfering with her rights under ERISA. *See Majewski* 274 F.3d at 1113 (applying the *McDonnell Douglas* framework to ERISA-interference claim; plaintiff "must demonstrate not only that he lost the opportunity to accrue new benefits, but also that ADP had the specific intent of avoiding ERISA liability when it discharged him."); *see also Ameritech*, 129 F.3d at 865 (same; granting summary judgment because the plaintiff failed to show pretext).

Accordingly, Defendants are entitled to summary judgment on Plaintiff's ERISA-interference claim in Count 4 of her Complaint.

## IV. Plaintiff's Motion For The Court To Restrain From Ruling On Motion For Summary Judgment

Plaintiff's counsel seeks to stay Defendants' Motion for Summary Judgment for twenty-one days because the deposition of Carolyn Carlton has not been taken. Plaintiff's counsel explains that he listed Carlton as a witness he wanted to depose in a letter on January 12, 2012, and "[a]lthough numerous attempts have been made to depose her, she has been unavailable and is now in Alaska." (Doc. #35, PageID at 781). Counsel notes that Plaintiff will have to depose Carlton either in Alaska or by video. Plaintiff's counsel therefore needs "an additional twenty-one days … to complete that and file a supplement Brief in Opposition to Motion for Summary Judgment as provided by FRCP56(d) [sic]." *Id*.

"Where the full period for pretrial discovery has run its course, a party should generally be precluded from reopening discovery months after it has closed in a last-ditch attempt to salvage a deficient claim or defense." *Majewski*, 274 F.3d at 1114.

The original discovery deadline in this case was May 31, 2012. (Doc. #12). The parties together sought, and the Court granted, an extension of the discovery deadline to June 30, 2012. Before that date, Plaintiff's counsel did not file a Motion to Compel or a memorandum notifying the Court that he was having difficulty scheduling Carlton's deposition. The first indication in the record that Plaintiff had been unable to depose Carlton occurred on September 6, 2012 when Plaintiff's counsel filed the Motion for the Court to Refrain from Ruling on Motion for Summary Judgment. Yet, by then the parties had completed briefing on the issues raised in Defendants' Motion for Summary Judgment. And discovery had been closed for more than ten weeks. Although Plaintiff's counsel states that Carlton "has been unavailable" for deposition (Doc. #35, PageID at 781), there is no explanation of why he waited until ten weeks after the close of discovery, and after Defendants' Motion for Summary Judgment was fully briefed, to seek judicial intervention. Plaintiff's counsel overlooks, moreover, that trial is scheduled to begin on November 5, 2012, a fact known to all parties many months ago, on February 7, 2012. (Doc. #12). Because of this, Defendants would likely

suffer prejudice if Plaintiff is granted a twenty-one-day extension for Carlton's deposition plus supplemental briefing. With trial fast-approaching, Defendants would be hindered, if not prevented, from marshaling new evidence in response to Carlton's deposition testimony. And a further extension of summary-judgment briefing would like be needed to enable Defendants to file a response to Plaintiff's proposed supplemental briefing.

For all the above reasons, good cause does not exist in this case to part from the general rule that precludes a party "from reopening discovery months after it has closed in a last-ditch attempt to salvage a deficient claim or defense." *Majewski*, 274 F.3d at 1114.

## IT IS THEREFORE ORDERED THAT:

1.    Plaintiff's Motion for the Court to Refrain from Ruling on Motion for Summary Judgment FRCP [sic] 56(d) (Doc. #35) is DENEID;

2.    Defendants' Motion for Summary Judgment (Doc. #24) is GRANTED; and

3.    The case is terminated on the docket of this Court

September 27, 2012

     s/ Sharon L. Ovington
     Sharon L. Ovington
     United States Magistrate Judge
